Alene Ray, an individual person,
Karen Larsen, Guardian of Josephine
M. Ray,

       Plaintiffs,

                              MEMORANDUM OPINION
                              AND ORDER
v.                              Civil No. 08-922 (MJD/JJK)

Ruth Hauff, individually and
in her capacity as employee
of Lutheran Social Services, and
Lutheran Social Services, a non-profit
organization,

       Defendants.
_____

      Beau D. McGraw, McGraw Law Firm, P.A., Counsel for Plaintiffs.

      Stephen O. Plunkett, Shanda K. Pearson and Steven P. Aggergaard,
Bassford Remele, A Professional Association, Counsel for Defendants.
_____

      This matter is before the Court upon Defendants' motion for summary

judgment.

**Background**

      Plaintiff Alene Ray is the adoptive mother of Josephine ("Josie") M. Ray,

who is currently 23 years of age. Josie Ray was declared a vulnerable adult as of

September 14, 2004. (Plunkett Decl., Ex. A (Alene Ray Dep. at 136).) Josie suffers

from physical and mental impairments that prevent her from providing her own

care. (Comp. ¶ 16.) She suffers from seizures that require medication and she

has borderline intellectual functioning, with an IQ below 70. (Plunkett Decl., Ex.

I.)

Josie was adopted by Alene Ray when she was two years old. (McGraw

Decl., Ex. A (Ray Dep. at 17).) Josie had lived with her biological parents until

she was eleven months old, then was placed in foster care after it was determined

that her parents were not providing her proper medical care. For example, when

she was six months old, she developed meningitis, but her parents did not seek

out medical treatment for over two weeks. (Id.) By the time she was seen by a

doctor, she was suffering from hydrocephalus. (Id.) It was also discovered that

she had suffered from two broken bones in her arms that were never treated.

(Id.)

Alene Ray was a licensed foster care provider who provided relief to full-

time foster care providers. Alene met Josie when she provided relief to Josie's

full-time foster care provider. (Id. at 16.) In September 1988, Alene applied to

adopt Josie, and in March 1989, Josie permanently moved into Alene's home.

As Josie approached her teen years, she began to act out and to have problems with Alene. (Plunkett Decl., Ex. A (Ray Dep. at 71-74).) At age 15 or 16, Josie began to call chat lines and invited men to her home while Alene was at work. (Id. at 45-46, 55-56.) Alene would occasionally find Josie with older men she had met in chat rooms, or learn she had been in contact with such men. (Comp. ¶ 17.) Alene became worried that Josie would not be able to make good decisions about her interactions with men due to her mental limitations. (Id.) It was later discovered that Josie had, on at least one occasion, had sexual intercourse with one of the men she met through a chat line. (Plunkett Decl., Ex. A (Ray Dep. at 57-60, 76-77).)

Josie had also run away from home on a number of occasions. (Id. at 58, 133-34.) On one such occasion, Alene tried to physically restrain Josie, which resulted in Josie breaking a finger. (Id. at 94-95.) Ramsey County Adult Protection became involved as a result of this incident, and Josie stayed at a shelter for a short period of time. (Id. at 98-100, 107-08.) In February 2003, Alene arranged for Josie to take part in treatment at the Falcon Ridge Ranch in Utah. (Id. at 67.) She attended Falcon Ridge from February 18, 2003 through October

16, 2003, where she received counseling to deal with anger issues and her tendency to run off with older men.  (Id. at 106.)

After returning home, Josie continued to contact men via chat lines.  Alene was relying on friends, family and neighbors to help her control Josie and her tendency to run away and become sexual with men.  When these resources were exhausted, Alene sent Josie to stay with friends of hers, Patti and Ted Warner, who lived in Aitken, Minnesota.  (Id. at 131-32, 134-35.)  Josie stayed with the Warners off and on beginning in late July through September 2004.  When Josie stayed with the Warners during the week, Josie was alone with Ted Warner while Patti worked in the cities.  Alene was aware of this situation.  (Id. at 135.)

In early September 2004, while staying with the Warners, Josie called a crisis hot line and reported that she had been sexually assaulted by Ted Warner. (Id. at 138.)   Ted Warner was ultimately charged with multiple counts of criminal sexual contact, to which he entered into a plea of guilty.  (Comp. ¶ 29.) Alene claims to not know much about what occurred between Josie and Ted Warner.  (Plunkett Decl., Ex. A (Ray Dep. at 142-43.)  She states that she has not talked with Josie about it, but has learned from others that Josie watched pornographic movies with Ted Warner and then had sexual intercourse with

him.  (Id. at 143-46.)  Josie claims that she had sexual intercourse with Ted

Warner seven times, all but the first time was non-consensual.  (Id., Ex. B.

(Warner Criminal Complaint).)  At the time Josie was sent to stay with the

Warners, Ted was already a registered sex offender, but Alene claims that she

was unaware of such fact.  (Id., Ex. A (Ray Dep. at 132).)  Later, a Ramsey County

Human Services Judge determined that Alene did not knowingly send her

daughter to stay with a registered sex offender.  (McGraw Decl, Ex. C at 5.)

Plaintiffs claim that after Josie was sexually assaulted by Ted Warner,

Ramsey County filed an emergency petition for the appointment of a guardian,

alleging that Alene knowingly sent Josie to stay with a sex offender.  (Comp. ¶

30.)  Defendants assert that Josie was admitted to the hospital on December 8,

2004 for seizure monitoring, psychological and psychiatric evaluation and

possible adult protection issues.  (Plunkett Decl., Ex. C (Inpatient Social Work

Progress Notes).)  During this hospitalization, Josie told multiple caregivers that

she was not safe at home.  (Id.; Ex. D at 1.)  Josie reported physical and verbal

abuse by Alene.  (Id.)  Alene acknowledges that Josie had made allegations that

Alene abused her.  (Id., Ex. A (Ray Dep. at 177).)

Prior to her hospitalization in December 2004, Josie had been hospitalized

on two previous occasions for suicide attempts, and the hospitalization records for those stays indicate that Josie had reported multiple incidents of abuse and/or neglect.  (Id., Ex. D at 2-3.)  Josie's treating neurologist, Dr. Beverly Wical, opined that Josie was not receiving adequate psychiatric or psychological follow up after either hospitalization.  (Id.; Ex. A (Ray Dep. at 114).)  It was also determined that Josie was not taking her medications to control her seizures, and that Alene was not monitoring her intake.  (Id., Ex. D.)  As a result of these findings, Dr. Wical and Josie's other medical providers determined that Josie's home environment was not optimal, and Ramsey Count Adult Protection was contacted.  (Id. at 4.)  Dr. Wical also recommended that Josie be appointed a guardian.  (Id.)  Upon Josie's release from the hospital in December 2004, she was placed at Grand Forest Lane House, a group home operated by Meriweather Ventures.  (Jonsgaard Aff. ¶ 4.a.)  Defendant Lutheran Social Services ("LSS") was then appointed by the Court to be Josie's emergency guardian.  (Plunkett Decl., Ex. F.)[1]

---

[1] Ramsey County and LSS entered into a contract, which was in force as of January 1, 2004 through December 2006, by which Ramsey County agreed to pay LSS to perform as court-appointed guardians and conservators.  (Id., Ex. E.)  Pursuant to this contract, LSS retained full control over their guardianship services it employees provided.  (Id. Section IX.)

In the Order appointing LSS as emergency guardian, the Court included Findings of Fact stating that Josie was "in need of immediate decisions regarding her safe placement, medication adjustments and other decisions involving her personal safety." (Id., Ex. F.) The Court also concluded that Josie would "likely suffer from substantial harm if an emergency guardian is not appointed." (Id.) The Court's Order also set forth the powers and duties of the guardian, such as making decisions regarding Josie's custody, care, place of abode and medications, and supervision of Josie. (Id.) Defendant Ruth Hauff ("Hauff"), an LSS employee, was selected as Josie's guardian.

After being assigned Josie's guardian, Hauff learned that Ramsey County was conducting a vulnerable adult investigation into Alene. (Hauff Aff. ¶¶ 2 and 3.) Hauff then spoke with a number of persons involved in the investigation, and to Josie, by which she learned more about Josie's medical history and the allegations and information contained in her records. (Id. ¶ 4.) Hauff also learned of the conflicts between Josie and Alene, Josie's behavior issues, including her inappropriate contacts with men, and her tendency to run away from home. (Id. ¶ 5.)

By Order dated January 19, 2005, the Court extended LSS's appointment as

Josie's guardian, finding that Josie was still in need of such services. (Plunkett Decl., Ex. F.) Josie remained at Grand Forest Lane House until January 5, 2005, at which time she was transferred to Mount Olivet Rolling Acres - a locked facility in Victoria, Minnesota, given Josie's tendency to run away. (Hauff Aff. ¶ 9.) Hauff believes that Josie made progress there, and determined that she was ready for a less-secure facility. (Id.) While at Mount Olivet, however, Alene alleges that she was only allowed to visit Josie three times. (McGraw Decl. Ex. A (Ray Dep. at 186).) On April 5, 2005, Josie was moved to the Quebec House in New Hope, Minnesota, and remained there until August 2006. (Hauff Aff. ¶ 11.) Alene alleges that she was only allowed to visit Josie three times while she was at Quebec House. (McGraw Decl., Ex. A (Ray Dep. at 187).)

Hauff acknowledges that she placed restrictions on Alene's contacts with Josie right after she was appointed guardian given the nature of the allegations made by Josie and the ongoing adult-protection investigation. (Hauff Aff. ¶ 8.) For example, Hauff did not allow Alene to talk with Josie for the first nine days after LSS's appointment as guardian. (Id. ¶ 8.) When contact was finally allowed, it was through supervised visits. (Plunkett Decl., Ex. A (Ray Dep. at 186.) While Josie was at Mount Olivet, Alene was allowed phone contact with

Josie and to send her letters. (Id. at 220.) Alene was also allowed supervised telephone calls and visits while Josie was at the Quebec House. (Id. at 186.) At all times, Hauff also placed parameters on Alene's conversations with Josie. She was not allowed to talk with Josie about Ted Warner, the guardianship and Josie's allegations against Alene. (Id. at 223; Hauff Aff., Exs. A-D.)

In May 2005, Hauff sent Alene a letter to inform her of reports by staff at the Quebec House that Alene was talking with Josie about the prohibited topics - such as talking with Josie about court dates and the guardianship. (Hauff Aff., Ex. C.) Hauff also noted her concerns that Alene told Josie she did not need to obtain a GED, because Alene thought she had completed her schooling online. Josie reported, however, that she never received a high school diploma. (Id.) In a letter dated September 14, 2005, Hauff noted her concerns about Alene taking Josie to the Mall without prior permission. (Id., Ex. D.) Hauff was also upset about reports that Alene was behaving badly toward staff at the Quebec House, and that Alene had given Josie "diet supplements" without permission and without the packaging. (Id.)

Alene asserts that staff at the Quebec House were not properly handling Josie's medical needs. During the period of time Hauff and LSS were her

9

guardian, she alleges that Josie gained approximately 70 pounds.  (Comp. ¶ 37.)

Also, Alene alleges that during a visit with Josie, Josie had a seizure.  When she

notified staff, the staff told Alene that they did not know Josie had seizures.

(McGraw Decl., Ex. F (Answers to Interrogatory 3b).)  Alene also alleges that Josie

was assaulted or physically threatened while residing at the Quebec House, but

that neither Hauff nor any staff member took any action.  (Comp. ¶ 35.)

On May 31, 2005, Alene was notified by Ramsey County's Human Services

Department that it had substantiated findings for the allegation of neglect of Josie

by Alene.  (Plunkett Decl., Ex. K.)  Upon further review, the Manager of the

Ramsey County Human Services Department determined that the such

disposition was correct.  (Id., Ex. L.)  Alene appealed this finding, and in a

decision dated April 10, 2006, Human Services Judge Inta M. Sellars determined

that Ramsey County had not met its burden of proof and ordered that the

maltreatment determination be reversed.  (Id., Ex. M.)  Chief Human Services

Judge Kenneth M. Mentz adopted Judge Sellars' decision.  (Id. at 6.)

In May 2006, the Quebec Home staff reported observing Alene

inappropriately kissing Josie and sticking her tongue in Josie's mouth during a

visit.  (Id., Ex. N.)  According to the report, after the inappropriate kiss, Josie

jumped back and said "What are you doing?  Trying to be sexy with me."  (Id., at

1.)  During her deposition, Alene admitted that she stuck her tongue in Josie's

mouth, describing it as "a little game we play.  Q: Where you put your tongue in

Josie's mouth?  A. It's like a little frog or a little snake, yup."  (Id., Ex. A (Ray Dep.

at 183-184).)  Based on this report, a vulnerable adult maltreatment report was

made.  (Id., Ex. N. at 3, Ex. O (Letter from Washington County).)   Washington

County investigated this report to avoid any conflict with Ramsey County's

earlier abuse report, and found that the allegations were disturbing, and

restricted Alene's visits based on these reports.  (Id.)  However, as the mouth is

not considered an intimate body part, the incident was not found to be sexual

abuse.  (Id.)

In July 2006, by agreement of the parties, Karen Larsen was appointed

guardian for Josie.  (Plunkett Decl., Ex. P.)

**Complaint**

Plaintiffs Karen Larsen and Alene Ray brought a number of claims against

LSS, Hauff, Ramsey County, as well as a number of Ramsey County employees

and Opal Services, Inc.  Claims against Ramsey County and its employees were

dismissed with prejudice by stipulation of the parties.  (Doc. No. 42.)  Defendant

Opal Services, Inc. and Plaintiffs entered into a Settlement Agreement and the claims against Opal Services have been dismissed. (Doc. No. 40.) LSS and Hauff are the only remaining defendants.

In Count I, Plaintiffs have asserted a claim pursuant to 42 U.S.C. § 1983 against LSS and Hauff, alleging that they acted separately and in concert outside the scope of their jurisdiction and acted knowingly, willfully and purposefully to deprive Plaintiffs of equal protection under the law. Plaintiffs further allege in Count II of their Complaint, that as a direct and proximate cause of defendants' negligence, Plaintiffs have been damaged. Plaintiffs further allege that LSS, as Hauff's employer, is vicariously liable for Hauff's conduct.

Plaintiffs also allege in Count V that Hauff and LSS have defamed Alene Ray by telling various care providers that Alene Ray maltreated her daughter and other such statements, and that such statements were false and have harmed Alene's relationship with her daughter. Finally, in Count VI, Plaintiffs allege that Alene Ray has a constitutional right to have an intimate relationship with her daughter, and that Defendants have interfered with that right.

## Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. <u>Celotex</u>, 477 U.S. at 323. This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325. The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir.1995).

**Analysis**

### A.    Plaintiffs Did Not Properly Plead Claims on Josie's Behalf

Josie is not a named Plaintiff. Minnesota law provides that to bring claims on behalf of a person without the legal competency to bring the action, such action should be brought in the name of the incompetent person by her legal guardian, rather than in the name of the guardian. <u>See</u> <u>Parrish v. Peoples</u>, 215 Minn. 589, 9 N.W.2d 225, 230 (1943). The Court will construe the pleadings Karen Larsen, guardian to Josie Ray, bringing claims on Josie's behalf.

## B. Negligence and Vicarious Liability Claims

Plaintiffs allege that due to Defendants' negligence, Josie was harmed.[2] Plaintiffs assert that Hauff had a duty to provide for Josie's care, comfort and maintenance needs, and that there are fact questions as to Josie's care which render summary judgment inappropriate. Plaintiffs further argue that a guardian can be held liable for the harm done to Josie by third parties. Minn. Stat. § 524.5315(b) provides that a "guardian who exercises reasonable care in choosing a third person providing medical or other care, treatment, or service for the ward is not liable for injury to the ward resulting from the wrongful conduct of the third person." Plaintiffs argue that when a guardian does not exercise reasonable care in choosing a third party to provide medical or other care to a ward, then the guardian can be held liable for injuries resulting from such care. Thus, whether Hauff exercised reasonable care in choosing the group home placements for Josie is a question for the jury.

Defendants argue that the claims asserted against them are premised on the guardian's role and duties to her ward. Minnesota Probate Code, Chapter 524 governs court-appointed guardians, and unambiguously affords such

---

[2]Plaintiffs do not assert that a duty was owed to Alene Ray.

guardians statutory immunity from "personal or monetary liability." Minn. Stat. §§ 524.5-313(c)(2) and 315(b). Specifically, the statute provides that the duties and powers of a guardian include, but are not limited to "the duty to provide for the ward's care, comfort, and maintenance needs, including food, clothing, shelter, health care, social and recreational requirements, and, whenever appropriate, training, education, and habilitation or rehabilitation." Minn. Stat. § 524.5-313(c)(2). If a guardian fails in carrying out these duties, such failure is grounds for removal, but not grounds for personal or monetary liability. Id.

Defendants argue that Plaintiffs' claims against them involve the decisions made with respect to Josie's placement at the Quebec Home and the health care provided to Josie. Any criticisms directed towards the decisions made by Hauff as to Josie's placement and medical care cannot be the basis of a claim, because those decisions are protected by absolute immunity. See Tindall v. Rogosheske, 428 N.W.2d 386, 387 (Minn. 1988) (finding that guardians ad litem are entitled to absolute immunity for conduct within the scope of their duties).

Plaintiffs respond that Defendants are not entitled to statutory immunity because such immunity is an unconstitutional deprivation of their rights to due process under the United States and Minnesota Constitutions. Plaintiffs argue

that given the nature of a guardian's duties - to render control over the life of a

vulnerable adult/ward - providing immunity could potentially allow a guardian

to steal all of the ward's money or leave the ward for dead on the side of the

road.  Plaintiffs have provided no authority for this argument, however.

The constitutionality of the immunity provisions in the Minnesota Probate

Code is not properly before the Court.  Pursuant to Rule 5.1(a)(1)(B) of the

Federal Rules of Civil Procedure, a party that is challenging the constitutionality

of a state statute must first file a notice of constitutional question stating the

question and identifying the paper that raises it where the state or one of its

agencies is not a party to the case, upon the state attorney general.  Such notice

was not given in this case, therefore this Court cannot certify the question to the

Attorney General to provide the State of Minnesota the opportunity to intervene,

as required by Fed. R. Civ. P. 5.1(b) and 28 U.S.C. § 2403(b).[3]

Even if notice of the constitutional claim had been given, it is unlikely that

the Minnesota Supreme Court would find merit to such claim.  The Minnesota

---

[3]At oral argument, Plaintiffs' counsel did not address the constitutional question or the
fact that notice was not provided to the Minnesota Attorney General as required by Fed. R. Civ.
P. 5.1(a).  It thus appears that Plaintiffs have abandoned their constitutional claims with respect
to the immunity provisions in Minn. Stat. §§ 524.5-313(c)(2).

Supreme Court has already determined that guardians ad litem are entitled to absolute immunity for acts arising within the scope of the guardians' duties.

> A guardian ad litem is an officer of the court. The guardian's duty is to act within the course of that judicial proceeding in furtherance of the best interests of the child for whom the guardian has been appointed. The guardian must be free, in furtherance of the goal for which the appointment was made, to engage in a vigorous and autonomous representation of the child. Immunity is necessary to avoid harassment from disgruntled parents who may take issue with any or all of the guardian's actions.

Tindall, 428 N.W.2d at 387 (internal citations omitted). Similarly, a guardian for a vulnerable adult is an officer of the court, whose duties are to act in the best interests of their ward. Like a guardian ad litem, immunity for guardians of vulnerable adults is necessary to avoid harassment from disgruntled parents or relatives who take issue with the guardian's decisions.

Absolute immunity only applies to acts conducted within the scope of the guardian's duties. Therefore immunity would not extend to every act committed by a guardian. For example, a guardian that is accused of taking all of a ward's money or leaving a ward dead by the road would be liable for damages because such acts are clearly not within the scope of a guardian's duties. Defendants are thus entitled to absolute immunity to the extent Plaintiffs' negligence claims

concern the care, comfort and maintenance needs of Josie pursuant to Minn. Stat.

§ 524.5-313(c)(2). The acts complained of by Plaintiffs concern Hauff's decisions

or actions concerning Josie's care, medical needs or her placement. Such acts all

fall within the scope of Hauff's duty as guardian. Accordingly, Defendants are

thus absolutely immune from liability as to the state claims of negligence asserted

against them.

Defendants further argue that with regard to Hauff's decisions as to Josie's

placement at Mount Olivet and the Quebec House, Hauff acted reasonably as a

matter of law. Before placement decisions were made, Hauff met with staff

members at Mount Olivet and Quebec House to discuss Josie's medical history

and needs. (Hauff Aff. ¶¶ 6-7.) She considered both placements to be reputable.

(Id. ¶ 7.) Hauff also conferred with Josie's social workers, staff and Josie before

and during her placements at both Mount Olivet and Quebec House. (Id.; Exs.

A-D.)

The Court finds that Plaintiffs have not demonstrated that Hauff's

decisions to place Josie in either Mount Olivet or Quebec House were

unreasonable. Plaintiffs have not provided any evidence that either Mount

Olivet or Quebec House was disreputable and that such information was

available to Hauff prior to her placing Josie at such facilities.  Nor have Plaintiffs put forth any evidence that Mount Olivet or Quebec House were not equipped to meet any of Josie's needs.  Based on this record, the Court finds that as a matter of law, Hauff's decisions to place Josie at Mount Olivet or Quebec House was reasonable.  Accordingly, Defendants are not liable for any alleged harm Josie incurred while at either facility.  Minn. Stat. § 524.5-315(b).

### C.      Section 1983 Claim

Plaintiffs further allege that Defendants violated their constitutional right to equal protection and their constitutional right to freedom of intimate or familial association.  To establish an equal protection claim, Plaintiffs must prove Defendants treated them differently from similarly situated people.  <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439 (1985).  Plaintiffs have not identified any similarly situated persons that have been treated differently by Defendants.  In fact, Plaintiffs do not even allege that they were treated differently than similarly situated persons.  Accordingly, the Court finds that to the extent Plaintiffs' Section 1983 is based on a violation of the equal protection clause, such claim is without merit.

With respect to Plaintiffs' claims that Defendants violated their

constitutional rights to freedom of intimate association, Plaintiffs assert that the record clearly demonstrates that Hauff repeatedly interfered with Alene and Josie's relationship.  For example, Plaintiffs have submitted a number of Guardian/Conservatorship Client Information forms which note in capital letters that Alene is not to have unsupervised visits with Josie.  (McGraw Decl., Ex. G.) Hauff further admitted in her affidavit that it was her intent to keep Alene and Josie apart.  (Hauff Aff. ¶ 8.)[4]  Plaintiffs further assert that their right to freedom of intimate association is sufficiently clear so that the Defendants could reasonably have known that they were violating such rights.

To hold Defendants liable for a violation of the right to intimate association, Plaintiffs must show an intent to interfere with their familial relationship.  <u>Reasonover v. St. Louis Cty, Mo.</u>, 447 F.3d 569, 585 (8th Cir. 2006). Even if Plaintiffs put forth evidence of such intent, Defendants may nonetheless be entitled to summary judgment if the asserted constitutional right was not sufficiently clear such that Defendants reasonably could have understood they were violating it.  <u>Id.</u>

---

[4]While Hauff initially denied contact between Alene and Josie, by May 2005, however, Hauff did allow Alene contact with Josie, under certain conditions.  (Hauff Aff. ¶ 12.)

While there may be a constitutional right to familial association, such right "is limited by the compelling governmental interest in protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves." <u>Myers v. Morris</u>, 810 F.2d 1437, 1462 (8th Cir. 1987) <u>overruled on other grounds</u>, <u>Burns v. Reed</u>, 500 U.S. 478 (1991).  While the child at issue here is an adult, she is a vulnerable adult under court-ordered supervision because she was considered in need of protection from her mother.  It is true that a finding of maltreatment against Alene was ultimately dropped, the record is replete with examples of ongoing concerns of Hauff and the staff members at Quebec House as to Alene's interactions with Josie. Nonetheless, the Court must keep in mind the fact that during the time in which contact between mother and daughter was limited, there was an ongoing court proceeding as to whether Josie had been maltreated by her mother.  Against this backdrop, the Court must find that any constitutional right to a familial association was not sufficiently clear such that Defendants, guardians of a vulnerable adult, could have understood that such right was being violated.  <u>See</u> <u>Reasonover</u>, 447 F.3d at 585.  Summary judgment is thus appropriate as to Plaintiffs' claim that their constitutional rights to familial association were

violated.

**D.     Defamation**

Plaintiffs have also asserted a defamation claim against Hauff for allegedly telling Josie that Alene is an abuser and not a good mother.  (Am. Comp. ¶ 42.) Defendants argue that they are entitled to summary judgment as to this claim as it is time-barred.  Pursuant to statute, a defamation claim must be brought within two years.  Minn. Stat. § 541.07.  Plaintiffs assert that the defamation claim is not time-barred as Josie affirmed in her affidavit that such statements were made to her by Hauff after April 11, 2006.  (McGraw Decl., Ex. 9 (Josie Ray Aff. ¶ 11).)  As the Complaint was filed on March 24, 2008, the claims are timely.

Defendants further argue the defamation claims must nonetheless be dismissed because such statements are subject to an absolute or qualified privilege.  Minnesota law provides that certain statements, uttered on a privileged occasion by a privileged person to one within the privilege, are not subject to liability for libel or slander.  <u>Matthis v. Kennedy</u>, 243 Minn. 219, 223, 67 N.W.2d 413, 417 (1954).  Statements made in the context of a judicial or quasi-judicial proceeding are entitled to an absolute privilege.  <u>Id.</u>  This privilege may extend to statements published prior to a judicial proceeding, but the statements

must have some relation to the judicial proceeding.  <u>Mahoney & Hagberg v.</u>

<u>Newgard</u>, 729 N.W.2d 302, 306 (Minn. 2007).

> In the context of absolute privilege, statements may be relevant, and
> therefore protected, if the statements "have reference and relation to the
> subject matter of the action and [they are] connected therewith[.]  In other
> words, does it have reference to or relation to or connection with the case
> before the court?

<u>Id.</u> (quoting <u>Matthis</u>, 243 Minn. at 225, 67 N.W.2d at 418.)  The relevance of a

statement is a question of law, and doubts as to relevance are to be resolved in

favor of finding the statements pertinent.  <u>Id.</u>

Defendants argue that the alleged defamatory statements made by Hauff

are relevant to judicial proceedings, specifically the court-ordered investigation

into allegations of abuse of a vulnerable adult by the mother.  All statements

made by Hauff were made for purposes of guardianship matters.  Defendants

ask that the Court apply the absolute privilege broadly, in order to encourage

frank and honest disclosures that in the end benefit persons, like Josie Ray.

As noted above, the defamation claim is supported by an affidavit from

Josie Ray.  In her affidavit, Josie stated that Hauff told her there were new

findings concerning her mother.  (Josie Aff., ¶ 12.)  These "new findings" concern

Alene Ray's self-described "little game" of sticking her tongue into Josie's mouth.

(Plunkett Decl., Ex. A (Ray Dep. at 183-84).)  The Washington county investigator found the allegations disturbing, and agreed with Hauff's decision to restrict visits based on these reports.  (Id., Ex. O at 4.)

As a matter of law, the Court finds that the alleged defamatory statements made to Josie by Hauff are protected by an absolute privilege.  It is clear the statements are relevant to her court-appointed duties as guardian to a vulnerable adult, and to the investigation into allegations of abuse by the mother as ordered by the state court.

In the alternative, Defendants argue the statements are subject to a qualified privilege.  "Qualified privileges have attached to a broader range of circumstances where the interest in shielding the defendant is considered less compelling, but still requiring some protection."  Moreno 610 N.W.2d at 328.  A qualified privilege has been applied to protect a publication "when it was made by a person in the discharge of a public or private duty, legal or moral, or in the conduct of his own affairs and in matters where is interest is concerned."  Id.  A showing of common law malice, ill will or improper motive will defeat a qualified privilege.  Id.

Plaintiffs argue that making defamatory and derogatory statements to a

vulnerable adult about her mother should not enjoy a privilege, as such statements have no relevance to a judicial proceeding. Plaintiffs further argue that such statements should not be protected by a qualified privilege because the motive behind Hauff's statements are a question of fact for a jury, especially in light of the fact that a maltreatment finding against Alene was reversed in April 2006.

Even if the Court were to find that the alleged statements by Hauff should be protected by a qualified privilege, summary judgment is nonetheless appropriate. Again, the alleged defamatory statements were made to Josie in the context of an investigation into alleged abuse by Alene concerning a "kissing game." No reasonable fact finder could conclude, under such circumstances, that Hauff's statements that Alene was an abuser or a bad mother were made with actual malice.

IT IS HEREBY ORDERED that Defendant LSS and Hauff's Motion for Summary Judgment [Doc. No. 45] is GRANTED.  This matter is dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date:   Marcy 31, 2010

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court

Civil No. 08-922